UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
-------------------------------------------------------
                                                :
UNITED STATES OF AMERICA,        :         CASE NO. 4:14-CR-00426
                                                :
        Plaintiff,                       :
                                                :
vs.                                           :         OPINION & ORDER
                                                :         [Resolving Doc. 47]
KEYONIA M. MOORER,              :
                                                :
        Defendant.                      :
                                                :
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

The Government charges Defendant Keyonia Moorer with conspiracy to distribute heroin. Moorer moves to suppress evidence obtained during and as a result of a stop and search of her car on October 7, 2014.[1] Moorer says that the government lacked reasonable suspicion to pull her over and that even if the stop was proper, the subsequent search of her car was not.[2]

The government generally says that the stop was justified by both reasonable suspicion of criminal activity and probable cause to issue a traffic citation, and that the search of Moorer's automobile was justified both by Moorer's consent and by the automobile exception to the warrant requirement.[3]

The Court held a hearing on Moorer's motion on February 10, 2015. The government called several of the officers involved in the investigation as witnesses, and Moorer called one of her passengers. Although the Court finds the decision close, the Court **DENIES** Moorer's motion to

---

[1] Doc. 47.
[2] *Id.*
[3] Doc. 57. The government also argues that a dog sniff performed during the traffic stop was not a search at all. *Id.*

Case No. 4:14-CR-00426
Gwin, J.

suppress.

# I. Background

In September and October 2014, the government was investigating an alleged drug trafficking group involving Vincent Moorer, Defendant Keynoia Moorer's brother.[4] This investigation included physical surveillance, location data from cell phones, "confidential informants for purchases," and a Title III wiretap of Vincent Moorer's phone.[5]

At the suppression hearing, Tim Hughes, one of the co-case agents for the investigation testified that the investigation revealed that Vincent Moorer was transporting heroin from Atlanta, Georgia, to Youngstown, Ohio.[6] In the course of the investigation, a confidential source told investigators that Vincent Moorer's group used Greyhound buses to transport the heroin.[7] Agent Hughes testified that the confidential source had "proven to be reliable." Hughes provided no additional information about the source or the basis for his conclusion of reliability.[8]

On October 6, 2014, the wiretap revealed a text message from Vincent Moorer to Charity Cousin. The text message read "U handle tht with wht I need dne will I c it tomorrow."[9] Later that day, Cousin called Vincent Moorer and said "tomorrow at 3:00." Vincent Moorer responded "all right, where, AK or YO?" Cousin said "AK."[10]

These communications caused Hughes to believe that Cousin would be sending narcotics to

---

[4] Suppression Hr'g Tr. at 5, 11. Throughout this order, references to "Moorer" are to Keyonia Moorer.
[5] *Id.* at 6.
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] Doc. 57 at 2; *see* Suppression Hr'g Tr. at 8.
[10] Suppression Hr'g Tr. at 9.

Case No. 4:14-CR-00426
Gwin, J.

Moorer in Akron (as opposed to Youngstown) the next day at 3:00 PM. Hughes explained that his experience with drug investigations allowed him to interpret the otherwise innocent text as setting up a drug distribution.[11/]

Because the confidential informant said Vincent Moorer used Greyhound buses to transport drugs, the government checked the Greyhound bus schedule for the next day, October 7, 2014. The Government found that there was a Greyhound bus scheduled to travel from Atlanta to Akron with an arrival in Akron at 3:00 PM.[12/] After accessing the passenger manifest for this bus, the government determined that a ticket had been purchased for an individual with the last name Moorer.[13/]

The government then reviewed location data for Vincent Moorer's phone and determined that he was in the Akron area.[14/] Because they knew that he stayed with his sister, Defendant Keyonia Moorer, in Akron, the police established surveillance at Keyonia Moorer's house and at the bus station.[15/]

With that surveillance, Hughes observed Melvin Johnson's Dodge Charger at Keyonia Moorer's house, which further led him to believe that Vincent Moorer was there because Melvin Johnson "was Vincent's . . . best friend, and Vincent was known to drive [Johnson's] vehicle when he was in Youngstown."[16/] A sliver minivan was also in Keyonia Moorer's driveway.[17/]

---

[11/]*Id.* at 7-8.
[12/]*Id.* at 10.
[13/]*Id.*
[14/]*Id.*
[15/]*Id.* at 10-11.

[16/]*Id.* at 11. The transcript does contain a reference to location data showing that Vincent Moorer was in Atlanta on the day in question. *Id.* at 10. The Court concludes this is either the result of a transcription error or a result of the witness misspeaking. The examination proceeded on the assumption that Vincent Moorer was in Akron by asking about
(continued...)

Case No. 4:14-CR-00426
Gwin, J.

When the minivan left Defendant Keynoia Moorer's house, the police followed it to the bus station.[18] At the bus station, Detective Todd Sinsley was in the parking lot in plainclothes and an unmarked car.[19] Sinsley received word to be on the lookout for a silver minivan owned or driven by Keyonia Moorer that would be picking up a female passenger.[20] He saw the silver minivan pull up and pick up a female passenger.[21]

Sinsley followed the minivan out of the bus station onto Bartges Street. The minivan turned left from Bartges Street onto South Main Street, a one-way street. Sinsley testified that in doing so, it turned into the Main Street center lane rather than the left-most lane. Although such turns occur daily, the officer would now cite a violation of Ohio traffic law.[22] One of the passengers in the minivan, a witness for Moorer, testified that the car did in fact turn into the left-most lane.[23]

Sinsley then radioed to the marked cars in the area and reported that he had observed a traffic violation.[24] Sinsley did not pull over the minivan. Sinsley testified he did not want to reveal his identity or the unmarked car he was driving and that uniformed officers in marked cars were nearby to make the stop.[25]

---

[16](...continued) Melvin Johnson's car, *id.* at 11, and later in his testimony, Hughes said "Vincent was in Akron at that time, or his phone was in Akron at that time," *id.* at 12.
[17]*Id.* at 13.
[18]*Id.* at 13-14.
[19]*Id.* at 18.
[20]*Id.*
[21]*Id.* at 18-19.
[22]Ohio Rev. Code § 4511.36(A)(3).
[23]Suppression Hr'g Tr. at 56.
[24]*Id.* at 20.
[25]*Id.* at 20-21.

Case No. 4:14-CR-00426
Gwin, J.

A short distance later, Detective Troy Meech pulled the minivan over.[26] Keyonia Moorer was driving.[27] Also in the car were a passenger in the front seat and two passengers in the rear seat, one of whom was a small child.[28] Meech asked Moorer if she had a valid driver's license, and when Moorer said she did not, Meech ordered her out of the car.[29] Meech ultimately wrote a ticket that included three offenses: failure to signal for a lane change on South Main Street, improper left turn from Bartges onto South Main Street, and driving under suspension.[30] Meech did not personally observe any traffic violations; rather, he was relying on Detective Sinsley's report.[31]

Meech also testified that about ten or fifteen seconds after he ordered Keynoia Moorer out of the car, and while Meech was still running Moorer's information, Detective Alan Jones and his drug detection dog Midnight arrived.[32] Jones described the training he and Midnight engaged in on a regular basis.[33] Although Jones did not present any certifications or other documentary evidence, he testified generally that both his and Midnight's "training [is] current as required by any state regulations for the State of Ohio" and that both of their "training" was "up to date" on October 7, 2014, the date the stop occurred.[34]

Jones testified that he asked Moorer if Midnight could sniff the minivan, and that Moorer

---

[26] *Id.* at 28.
[27] *Id.*
[28] *Id.*
[29] *Id.* at 29.
[30] *Id.* at 30-33.
[31] *Id.* at 31.
[32] *Id.* at 30-31. Jones also testified that he arrived about thirty seconds after the car was stopped. *Id.* at 38.
[33] *Id.* at 36.
[34] *Id.* at 36-37.

Case No. 4:14-CR-00426
Gwin, J.

allowed it.[35/] Jones also testified that Moorer said something to the effect that there "shouldn't be anything in there that she had a problem with."[36/] While Jones said that he did not threaten Moorer or promise her anything in exchange for consent to search the car, he conceded that he did not read her *Miranda* rights or otherwise inform her that she could refuse consent.[37/]

Jones walked Midnight around the minivan. At that point the doors remained open from when the passengers had exited the car, and Midnight "went up into the vehicle and started to check inside the vehicle."[38/] Midnight then alerted to a backpack inside the vehicle by scratching at it.[39/] Upon searching the backpack, the police discovered two balls of heroin wrapped in electrical tape.[40/]

Sergeant Michael Yohe testified that after the police discovered the heroin in the backpack, Yohe read Moorer her *Miranda* rights.[41/] Yohe further testified that after being read her *Miranda* rights, Moorer agreed to make a statement.[42/]

## II. Legal Standards

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."[43/] "[S]topping an automobile and detaining its occupants constitute[s] a 'seizure' within the meaning of th[e] [Fourth] Amendment[], even though the purpose of the stop is limited and the

---

[35/]*Id.* at 39.
[36/]*Id.*
[37/]*Id.* at 41.
[38/]*Id.* at 39.
[39/]*Id.* at 39-40.
[40/]*Id.* at 40.
[41/]*Id.* at 44.
[42/]*Id.* at 45-46.
[43/]U.S. Const. Amend. IV.

Case No. 4:14-CR-00426
Gwin, J.

resulting detention quite brief."[44] An automobile stop is reasonable where the police have probable cause to believe that a traffic violation has occurred[45] or where the police have reasonable articulable suspicion of criminal activity.[46]

When the police perform a lawful traffic stop, they are automatically entitled to request that both the driver and any passengers exit the car.[47]

Although the Fourth Amendment generally requires police to have a warrant to conduct a search or seize property,[48] some exceptions exist. Most relevant to this case is the automobile exception to the warrant requirement. Under this exception, police may search a vehicle if they have probable cause to believe that it contains contraband or evidence of criminal activity.[49] Probable cause to search exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place."[50] Probable cause must be assessed by looking to the "totality-of-the-circumstances."[51] Individual pieces of evidence should not be considered in isolation.[52]

### III. Analysis

Because probable cause to believe that Keyonia Moorer's minivan contained contraband or other evidence of criminal activity would justify both the stop and the subsequent search, the Court begins there. Although this case presents a close question, the totality of the circumstances created

---

[44] *Delaware v. Prouse*, 440 U.S. 648, 653 (1979) (internal citation omitted).
[45] *See id.* at 659, 661, 663.
[46] *See United States v. Arvizu*, 534 U.S. 266, 275-77 (2002).
[47] *United States v. Hockenberry*, 730 F.3d 645, 658 (6th Cir. 2013) (driver) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977) (per curiam)); *Maryland v. Wilson*, 519 U.S. 408 (1997) (passengers).
[48] *United States v. McCraney*, 674 F.3d 614, 618 (6th Cir. 2012).
[49] *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007) (citations omitted).
[50] *Illinois v. Gates*, 462 U.S. 213, 238 (1983).
[51] *Id.* at 230.
[52] *Cf. Arvizu*, 534 U.S. at 274 (reaching the same conclusion in the reasonable suspicion context).

Case No. 4:14-CR-00426
Gwin, J.

a "fair probability" that Keyonia Moorer's minivan contained "contraband or evidence of criminal activity."

The police had been investigating a drug smuggling group involving Keyonia Moorer's brother for multiple months, and intercepted vague wiretapped communications that, although they did not directly mention drugs, were consistent with arranging the transportation of drugs. These communications identified a particular time and place–Akron at 3:00 PM on October 7, 2014–that something would be arriving from Atlanta.

The police combined this information with a tip from a confidential informant that the group used Greyhound buses to transport drugs. The informant's tip may not have meant much on its own without further evidence supporting the informant's reliability or basis of knowledge. But in combination with the police's further investigation revealing that a bus would be arriving from Atlanta to Akron at the exact time mentioned in the intercepted communications with a passenger whose last name was also Moorer, this tip supported the police's inferences.

Furthermore, the police obtained location data indicating that Vincent Moorer was in Akron, and, after setting up surveillance at Keyonia Moorer's house and the bus station, the police observed Melvin Johnson's Dodge Charger in Moorer's driveway. This indicated to them that Vincent Moorer was likely at his sister's house. The police then observed Keyonia Moorer drive to the bus station and pick up a female passenger.

Considering these pieces of evidence together as a whole as required by the totality of the circumstances inquiry, the police had enough to conclude that there was a "fair probability" that Moorer's minivan contained "contraband or other evidence of criminal activity." The stop was thus valid as an investigatory stop, and the subsequent search was valid pursuant to the automobile

Case No. 4:14-CR-00426
Gwin, J.

exception. The Court thus need not reach the government's alternative arguments for the legality of either.

That is perhaps lucky for the government, because each of its alternate grounds has substantial problems. Although the Court does not resolve whether these alternative arguments would ultimately be successful, the Court notes some of these problems below.

As to the government's argument that the stop was also justified based on probable cause to believe that Keyonia Moorer had committed a traffic violation by turning into the wrong lane, the inconsistency of the traffic ticket itself undermines this contention. The officer who pulled Moorer over and wrote the traffic ticket had not observed the violation himself. Rather, he was relying on the report of the undercover officer who had been following Moorer. The fact that the police officer who wrote the ticket also recorded a violation–that of the illegal lane change–that no police officer claimed to have observed undermines the claim that the allegedly illegal left turn occurred. Moreover, the Defendant presented a passenger in the minivan as a witness who testified that the turn was in fact into the proper far-left lane.

The government also argues that Moorer consented to the search of her car. The government bears the burden of demonstrating that consent was voluntary.[53] Voluntariness is determined by examining the totality of the circumstances.[54] In this case, the government concedes that Moorer was in custody when asked for consent, and that she had not been read her *Miranda* rights or otherwise informed of her right to withhold consent. Although these factors are not necessarily

---

[53] *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).
[54] *Id.* at 227.

-9-

Case No. 4:14-CR-00426
Gwin, J.

dispositive, and voluntary consent can still be found where they exist,[55] each of them counsels in favor of a finding that consent was not voluntarily given.

Finally, the government argues that the dog-sniff was not a search and thus did not need to be justified by probable cause or consent. The Government is correct that a dog sniff of the exterior of a car during a traffic stop does not constitute a search.[56] Here, though, there is at least some evidence that the dog handler led the dog inside the car. The government has cited no case, and the Court is aware of none, for the extension of the dog sniff rule to cases where the dog is brought inside the car rather than just around its exterior.

* * *

Despite these issues with the government's alternative arguments, the government has shown enough to establish probable cause (and, a fortiori, reasonable suspicion) of criminal activity. The stop and search were therefore not unconstitutional.

### IV. Conclusion

For the reasons above, the Court **DENIES** Keyonia Moorer's motion to suppress.

IT IS SO ORDERED.

Dated: February 13, 2014              s/ *James S. Gwin*
                                      JAMES S. GWIN
                                      UNITED STATES DISTRICT JUDGE

---

[55] *See* United States v. Thurman, 525 F. App'x 401 (6th Cir. 2013) (holding that the district court had not clearly erred in finding consent voluntary even though the defendant was in custody and had not been given *Miranda* warnings).
[56] *See, e.g.,* Illinois v. Cabelles, 543 U.S. 405, 410 (2005).